Filed 8/23/17

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| MARIA ELENA SPRUNK et al., | B268755 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC471171) |
| v. | |
| PRISMA LLC, | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of Los Angeles County.  Jane L. Johnson, Judge.  Affirmed.

Markun Zusman Freniere & Compton and Daria Dub Carlson for Defendant and Appellant.

Knapp, Petersen & Clarke, André E. Jardini, Gwen Freeman and K. L. Myles for Plaintiff and Respondent.

_____

The primary issue presented in this appeal is whether a defendant in a putative class action can waive its right to compel arbitration against absent class members by deciding not to seek arbitration against the named plaintiff. In deciding that issue, we must also consider the scope of the "futility" rule, which excuses a party in some circumstances from seeking to enforce an arbitration right when the state of the law at the time would make the effort futile.

We agree with the trial court that, under the circumstances of this case, defendant and appellant Prisma LLC, doing business as Plan B Club (Plan B) waived its right to seek arbitration by filing and then withdrawing a motion to compel arbitration against the named plaintiff, Maria Elena Sprunk, and then waiting until after a class had been certified to seek arbitration against class members. We therefore affirm the trial court's denial of Plan B's motion to compel arbitration.

## BACKGROUND

Sprunk is the named plaintiff in a wage and hour class action that the trial court certified on April 24, 2015. Plan B owns and operates a bar and restaurant in Los Angeles in which exotic (i.e., bikini-clad) dancers perform. Sprunk and the other class members are dancers who performed at Plan B.

Sprunk alleges that the dancers were misclassified as independent contractors rather than employees, and that they were consequently denied various benefits that the law requires for employees, such as minimum wages, meal periods, and reimbursement of expenses. Sprunk also alleges that Plan B misappropriated tips.

2

Sprunk and all other class members signed contracts containing an arbitration clause.  There were two versions of the arbitration clause.  One version, which was in effect prior to July 2011, did not specifically address class arbitration.[1]  The other version, which Plan B claimed was in effect beginning in July 2011, contained an express waiver.[2]  Sprunk signed the first version of the agreement.

1. *Proceedings in the Trial Court*

Sprunk filed her complaint on October 7, 2011.  On November 28, 2011, Plan B sent an arbitration demand.  Plan B's demand letter stated that "new case law has issued which permits demanding and requiring arbitration of individual claims despite class allegations," citing *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333 (*Concepcion*) and *Stolt-Nielsen*

---

[1] This category of arbitration agreement stated in its entirety:  "**Arbitration:**  Any dispute, statutory, contractual or tort, arising out of this Contract or Entertainer's performances, the relationship between the parties, or any other dispute between the parties, shall be decided by binding Arbitration, pursuant to the Federal Arbitration Act, and shall be before a neutral arbitrator agreed upon by the parties who shall be permitted to award any relief available in a Court.  Any award may be entered in any court having jurisdiction."

[2] That category of arbitration agreement was identical to the prior version, but added language stating:  "There is no right to class arbitration, and Entertainer must arbitrate individually. The Arbitrator shall have no power to consolidate claims of others or proceed as a class or representative action."  It also added the sentence, "Employer shall pay any costs of arbitration required by applicable law."

*S. A. v. AnimalFeeds Int'l Corp.* (2010) 559 U.S. 662 (*Stolt-Nielsen*).

The parties filed a joint initial status report on December 30, 2011, in which Plan B stated that it "wishes to file a motion to compel arbitration at the earliest available opportunity." Sprunk stated that she intended to oppose the arbitration motion, but agreed that Plan B's "contemplated motion to compel arbitration is an issue that should be resolved before discovery on the merits, or discovery with respect to class certification issues, is commenced."

On January 25, 2012, Plan B filed a "Petition to Compel Individual Arbitration and Stay Superior Court Proceedings." The petition sought arbitration of Sprunk's individual claims only.

Sprunk filed an opposition to the petition on February 15, 2012, in which she argued, among other things, that the "extremely broad" arbitration clause that Sprunk signed permitted arbitration of class claims. For that reason, Sprunk claimed that the court must decide "whether or not to order arbitration of all individual and class claims," or alternatively should deny Plan B's motion on the ground that it sought to limit the arbitration only to individual claims. Sprunk also argued that, to the extent the arbitration agreement is "construed as a class action waiver," Plan B could not compel arbitration because such a waiver would interfere with the right of employees to engage in collective action under federal law. In support of that argument Sprunk cited a January 3, 2012 decision by the National Labor Relations Board (Board). (*D. R. Horton, Inc.* (2012) 357 NLRB 2277 (*Horton I*), revd. in part *sub nom. D.R. Horton, Inc. v. N.L.R.B.* (5th Cir. 2013) 737 F.3d 344 (*Horton II*).)

4

On September 6, 2012, Plan B filed a notice withdrawing its motion for arbitration. Plan B filed an answer the same day. The answer included several affirmative defenses based upon the arbitration agreements. Plan B also filed a cross-complaint, which it amended on November 14, 2002.

The cross-complaint named Sprunk and 500 fictional "Roe" cross-defendants, whom Plan B described as "professional entertainers who performed under contract as exotic dancers" at Plan B's premises during the class period. Plan B alleged that it was entitled to a "setoff" in the form of the dance fees that the cross-defendants earned in the event that the cross-defendants were adjudicated to be employees. Plan B based the allegation on a provision in the cross-defendants' contracts stating that "[i]f Plan B were an 'employer' all dance fees would be its sole property," and that Plan B would pay the cross-defendants only "the legal minimum wage and any other benefits required by law."

On December 19, 2012, Sprunk filed a demurrer and a motion to strike in response to the cross-complaint. Before those motions could be heard, Plan B dismissed the cross-complaint without prejudice.

The parties proceeded with discovery. Sprunk served interrogatories and deposed four Plan B witnesses. Plan B served a document request on Sprunk and took her deposition. Plan B responded to Sprunk's interrogatories on February 20, 2013, again identifying the arbitration agreements as an affirmative defense.

Sprunk filed her class certification motion on September 19, 2014. In opposing class certification, Plan B argued that a class action was not superior to other forms of

litigation because the class members had signed arbitration agreements. Citing several federal district court decisions, Plan B asserted that it "could not have previously moved for individual arbitration of the claims of the unnamed class members" because the putative class members were not parties to the action prior to the time the court certified the class. In her reply, Sprunk argued that Plan B had waived the right to arbitrate by actively litigating the case.

The trial court granted class certification in a written order filed on April 24, 2015. The court rejected Plan B's arbitration argument. The court found that Plan B's delay in seeking arbitration—during which it took advantage of "the court's processes"—meant that Plan B had "waived its right to arbitrate at least as to Plaintiff's claims."

Following the court's ruling, the parties filed a joint status conference report in which Plan B stated that it intended to file a motion to compel individual arbitration "of the claims of Plaintiff and the Class Members." The court set a date for the motion to compel arbitration.

2. *Plan B's Motion to Compel Arbitration Against Class Members*

On August 12, 2015, Plan B filed two separate motions to compel arbitration directed to the class members who signed the two different versions of the arbitration agreement. In the motions Plan B again argued that it had not waived the right to compel arbitration against the unnamed class members because they were not parties until a class had been certified.

Plan B also argued that withdrawing its original motion to compel arbitration against Sprunk did not cause an unreasonable delay. Plan B claimed that it withdrew that motion because it

6

feared that, under the state of the law at the time, the court might order *classwide* arbitration, which Plan B did not want. Plan B argued that it "had no certainty" that the court would order only individual arbitration because the law at the time made class arbitration possible even if an arbitration agreement contained a class action waiver. In particular, Plan B relied on the holding in *Gentry v. Superior Court* (2007) 42 Cal.4th 443 (*Gentry*) that a class arbitration waiver in an employment arbitration agreement is invalid if class arbitration would provide a significantly more effective means of vindicating the unwaivable rights of employees than individual arbitration. (42 Cal.4th at p. 450.) Plan B claimed that *Gentry's* status was uncertain until our Supreme Court decided *Iskanian v. CLS Transportation Los Angeles LLC* (2014) 59 Cal.4th 348 (*Iskanian*).[3]

Sprunk opposed the motions on several grounds, including: (1) Plan B had waived its right to arbitrate; (2) the arbitration agreements were unconscionable; and (3) Plan B failed to provide sufficient evidence that the class members actually signed arbitration agreements.

The trial court heard the motions on October 15, 2015. The court rejected the argument that the arbitration agreements were

---

[3] In *Iskanian,* the court held that *Concepcion* abrogated the basis for the holding in *Gentry*. In *Concepcion,* the United States Supreme Court held that section 2 of the Federal Arbitration Act (the FAA, 9 U.S.C. § 1 et seq.) preempted "California's rule classifying most collective-arbitration waivers in consumer contracts as unconscionable," overruling our Supreme Court's decision in *Discover Bank v. Superior Court* (2005) 36 Cal.4th 148 (*Discover Bank*). (*Concepcion, supra,* 563 U.S. at pp. 340, 352.) We discuss the chronology of these decisions in more detail below.

7

unconscionable. However, the court ruled that Plan B had waived its right to compel arbitration based upon its delay in seeking arbitration of Sprunk's individual claims. The court concluded that the delay was both unreasonable and prejudicial.

The trial court considered and rejected Plan B's justifications for its delay in moving to compel arbitration. The court agreed with Plan B that, prior to certification, Plan B could not have compelled absent class members to arbitrate. However, the court concluded that Plan B had unreasonably delayed in seeking arbitration of *Sprunk's* claims. The court noted that Plan B "could have gone through with [its] motion with Ms. Sprunk" but instead "made a strategic decision" that it "didn't want to take the risk" of classwide arbitration. Even though Sprunk herself had signed only one form of the arbitration agreement, Plan B could have brought a motion directed to that version and "ended the case" if the trial court had ruled in its favor, without the need to brief and decide the class certification motion.

The trial court rejected Plan B's argument that the state of the law at the time it moved to compel arbitration against Sprunk would have made the motion "futile." The court observed that "[t]he law wasn't clearly against" Plan B, and concluded that Plan B simply decided it "didn't want to take the risk" of classwide arbitration. The court also found that Plan B delayed unreasonably in moving to compel arbitration even *after* the decision in *Iskanian*, which was filed in June 2014. (*Iskanian, supra,* 59 Cal.4th 348.)

The court found that the plaintiffs would be prejudiced by the four-year delay in adjudicating their claims if the court were to now order arbitration. The court also expressed concern that the plaintiffs might be reluctant to "come forward" to arbitrate

8

their claims individually due to "[t]he kind of business that they are in."

The court denied Plan B's motion in a written order filed on November 6, 2015.

## DISCUSSION

### 1. *Plan B Provided Sufficient Evidence of the Arbitration Agreements*

Sprunk initially argues that it is unnecessary to consider the trial court's waiver finding because Plan B did not provide adequate evidence to show that individual class members had actually signed arbitration agreements. Plan B supported its motions to compel arbitration with examples of the two different versions of the arbitration provision attached as exhibits to the declaration of Plan B's general manager, Frank Grundel. The pre-July 2011 version was signed by Sprunk; the copy of the later version was unsigned. On reply, Grundel submitted a supplemental declaration stating that "[e]ach and every Class Member signed one or more forms of the Entertainer Contracts attached to my original Declaration."

Sprunk argues that this evidence was insufficient to establish that the class members were actually parties to an arbitration agreement. Sprunk claims that "nothing excuses the failure to attach signed copies to prove the right to arbitrate as to each class member."

We reject the argument. Under the California Rules of Court, rule 3.1330, a party petitioning to compel arbitration must state "the provisions of the written agreement and the paragraph that provides for arbitration." "The provisions must be stated verbatim *or* a copy must be physically or electronically attached to the petition and incorporated by reference." (*Ibid.*, italics

9

added.) Thus, under this rule, unless there is a dispute over authenticity, it is sufficient for a party moving to compel arbitration to recite the terms of the governing provision. (See *Condee v. Longwood Management Corp.* (2001) 88 Cal.App.4th 215, 219 (*Condee*) [holding that rule 371, the predecessor to rule 3.1330, "does not require the petitioner to introduce the agreement into evidence or provide the court with anything more than a copy or recitation of its terms"].) The Grundel declarations met this requirement by providing the two different versions of the arbitration provision and stating that all class members signed at least one of those versions.

Sprunk's reliance on *Ruiz v. Moss Bros. Auto Group, Inc.* (2014) 232 Cal.App.4th 836 (*Ruiz*) is misplaced. In that case, there was a dispute about whether the plaintiff had actually signed an employment agreement. The defendant provided conclusory declarations that the plaintiff, Ruiz, had "electronically signed" the agreement. (*Id.* at p. 840.) Ruiz testified that he could not recall signing an arbitration provision. (*Ibid.*) The appellate court found sufficient evidence supporting the trial court's finding in favor of the plaintiff in the authentication dispute. The court distinguished *Condee*, *supra*, 88 Cal.App.4th 215, explaining that the court in that case held "that a petitioner is not required to authenticate an opposing party's signature on an arbitration agreement *as a preliminary matter* in moving for arbitration *or* in the event that authenticity of the signature is not challenged." (*Ruiz,* 232 Cal.App.4th at p. 846.)

Here, Sprunk did not challenge the truth of Plan B's claim that each class member signed an arbitration provision; she merely contested the sufficiency of Plan B's preliminary

10

evidentiary showing. Moreover, here, unlike in *Ruiz,* the trial court implicitly rejected Sprunk's authentication argument by considering the merits of Plan B's motion. The trial court's ruling was supported by sufficient evidence.

Sprunk also argues that the trial court should not have considered Grundel's statement that each class member signed one or the other versions of the arbitration agreement because the statement was submitted for the first time in his reply declaration. Sprunk objected to that declaration below on the ground that it included new evidence, and the trial court overruled the objection. The declaration responded to argument in Sprunk's opposition concerning the alleged lack of evidence "that any unnamed class member signed an arbitration agreement." The decision to consider the declaration was within the court's discretion. (*Alliant Ins. Services, Inc. v. Gaddy* (2008) 159 Cal.App.4th 1292, 1307–1308.)

We therefore proceed to consider Plan B's challenges to the trial court's finding that Plan B waived its arbitration right.

**2.** **Sufficient Evidence Supports the Trial Court's Waiver Finding**

**A.** **Standard of review**

Whether a party has waived the right to compel arbitration is generally a question of fact. A trial court's finding of waiver is therefore reviewed under the substantial evidence standard unless " 'the facts are undisputed and only one inference may reasonably be drawn,' " in which case " 'the reviewing court is not bound by the trial court's ruling.' " (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196 (*St. Agnes*), quoting *Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 319.)

11

While the parties here do not disagree over the relevant litigation events, they have very different positions concerning the inferences that should be drawn from those events. In particular, they disagree about the reasons for Plan B's delay in seeking to compel arbitration and whether Plan B's conduct was inconsistent with an intent to arbitrate. Because the trial court could reasonably draw different inferences from the undisputed events, we apply the substantial evidence standard in reviewing the court's findings on these issues. (*Bower v. Inter-Con Security Systems, Inc.* (2014) 232 Cal.App.4th 1035, 1043 (*Bower*) [substantial evidence standard applied where "different inferences may be drawn depending upon the weight to be afforded to certain facts"].) Under that standard, the trial court's finding of waiver is binding on this court if "supported by sufficient evidence." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 983 (*Engalla*).)

Plan B also raises a legal issue concerning the status of absent class members. Plan B argues that the trial court erred in considering Plan B's delay in moving to compel arbitration before the court decided class certification because the unnamed class members were not parties until a class was certified. Because this argument raises an issue of law concerning the time period that the trial court could properly consider in analyzing waiver, we review it de novo. (*Sky Sports, Inc. v. Superior Court* (2011) 201 Cal.App.4th 1363, 1367 (*Sky Sports*) [applying the de novo standard to the issue whether a defendant "waived its right to compel arbitration because it did not bring the motion before certification of a class that included parties to the arbitration agreement"].)

In reviewing the trial court's ruling, we also keep in mind the "strong policy favoring arbitration agreements" found in both the FAA and state law. (*St. Agnes, supra,* 31 Cal.4th at p. 1195.) In light of that policy, "waivers are not to be lightly inferred and the party seeking to establish a waiver bears a heavy burden of proof." (*Ibid.*)

B.     *Factors relevant to waiver*

Code of Civil Procedure section 1281.2 provides that, upon petition by a party to an arbitration agreement, a court shall order arbitration "if it determines that an agreement exists," unless it determines that "(a) [t]he right to compel arbitration has been waived by the petitioner; or [¶] (b) [g]rounds exist for the revocation of the agreement." Although "no single test delineates the nature of the conduct that will constitute a waiver of arbitration," our Supreme Court has identified various factors that are "relevant and properly considered in assessing waiver claims." (*St. Agnes, supra,* 31 Cal.4th at pp. 1195–1196.) Those factors, first articulated in *Sobremonte v. Superior Court* (1998) 61 Cal.App.4th 980, 992 (*Sobremonte*), are: " ' "(1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether 'the litigation machinery has been substantially invoked' and the parties 'were well into preparation of a lawsuit' before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) 'whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place'; and (6) whether the delay 'affected,

13

misled, or prejudiced' the opposing party." ' " (*St. Agnes,* 31 Cal.4th at p. 1196; *Sobremonte,* 61 Cal.App.4th at p. 992.)

The trial court repeatedly returned to the theme of Plan B's delay in discussing the specific *St. Agnes* factors. In doing so, the trial court correctly recognized that the issue of delay is dispositive here. Therefore, before analyzing the specific *St. Agnes* factors, we first consider the circumstances of, and Plan B's claimed justification for, the nearly four-year delay between the filing of this action and Plan B's motions to compel arbitration.

## C. *Substantial evidence supports the trial court's finding that Plan B delayed filing its motions to compel arbitration so that it could obtain a strategic advantage*

The trial court found that Plan B could have asserted its right to arbitrate against Sprunk, but made a strategic decision to delay doing so. Such conduct fits comfortably within the legal concept of waiver. As the court explained in *St. Agnes,* "While 'waiver' generally denotes the voluntary relinquishment of a known right, it can also refer to the loss of a right as a result of a party's failure to perform an act it is required to perform, regardless of the party's intent to relinquish the right." (*St. Agnes, supra,* 31 Cal.4th at p. 1195, fn. 4.) In the context of an arbitration right, waiver can result from " ' "[unreasonable delay] in undertaking the procedure." ' " (*Id.* at p. 1196; see *Engalla, supra,* 15 Cal.4th at p. 984 ["the evidence of Kaiser's course of delay, . . . which was arguably unreasonable or undertaken in bad faith, may provide sufficient grounds for a trier of fact to conclude that Kaiser has in fact waived its arbitration agreement"].)

14

Plan B does not dispute that unreasonable delay can cause waiver, but argues that it did not delay at all in seeking arbitration against the persons who were actually the subject of its motions. Plan B claims that it could not have moved for, or even demanded, arbitration from the *unnamed* class members until a class had been certified. Plan B therefore "assumes that had it brought motions to compel individual arbitration of the claims of the unnamed Class Members prior to certification, the Court would have denied the motions on the basis that the Court had no jurisdiction over them because they were not yet, and might never be if the class was not certified, parties to the litigation."

Along with Plan B, we may assume (without deciding) that a motion to compel arbitration against unnamed class members would have been premature until a class was certified. However, that is not the end of our inquiry. Sprunk *was* a party, and Plan B could have moved to compel arbitration against her. Indeed, it did so, and then decided to withdraw the motion. Thus, the critical issue is whether the trial court could consider Plan B's delay in moving to compel arbitration against *Sprunk* in determining whether Plan B waived its right to arbitrate against the unnamed class members, who ultimately did become parties and for whom Sprunk serves as the class representative. We conclude that, in the circumstances of this case, the trial court could properly do so.

### i. The trial court properly considered Plan B's delay in moving to compel arbitration against Sprunk

In considering the significance of Plan B's conduct, the trial court was not required to ignore the practical realities of the

15

litigation.  Sprunk was a signatory to an arbitration agreement.
Thus, as the trial court recognized, Plan B had the procedural
mechanism available to compel arbitration in a manner that, if
successful, would as a practical matter have resolved the judicial
proceedings with respect to the class.

Had Plan B forced Sprunk to individual arbitration, it
likely would have ended the judicial action.  While a different
named plaintiff could conceivably have filed a new action, all
class members were subject to an arbitration provision.  If
Sprunk had been forced to arbitrate, given the court's ruling it is
unlikely that any other plaintiff would attempt to litigate in
court.[4]  And, were someone to make the attempt, it is even less
likely that the result would be different in light of the principle of
stare decisis.

Plan B correctly points out that unnamed class members
would not technically have been bound by the trial court's rulings
prior to certification.  However, this fact does not affect the
waiver analysis.  By moving to compel arbitration against
Sprunk, Plan B could have effectively settled the question
whether the claims in this action should be adjudicated in a court

---

[4] The difference between the two forms of the arbitration
provision that the class members signed is immaterial to this
analysis.  The difference concerned whether the provision
contained an explicit class arbitration waiver.  The version that
Sprunk signed did not include such an explicit waiver.  Thus, if
Plan B had succeeded in compelling individual arbitration
against Sprunk, any potential class action plaintiff who had
signed the other version of the arbitration agreement would have
had an even weaker case to avoid individual arbitration.

or through arbitration, at least with respect to the form of the agreement that Sprunk signed.[5]

Instead, as the trial court observed, there is good reason to suspect that Plan B made a strategic decision to delay its motion to compel arbitration to give itself another opportunity to win the case by defeating a class. Plan B's stated reason for withdrawing its motion to compel arbitration against Sprunk was concern that, based upon the current state of the law, Plan B might be compelled to participate in class arbitration. Yet Plan B waited over a year to file its motions to compel arbitration after the Supreme Court decision that Plan B concedes settled the law in California on class arbitration waivers. Our Supreme Court issued its decision in *Iskanian* on June 23, 2014. Plan B did not

---

[5] This proviso is necessary because, as the trial court recognized, there is one scenario in which Plan B might have had a second chance to seek arbitration of some claims following class certification. If the trial court had denied a motion to arbitrate against Sprunk individually based upon the absence of an express class arbitration waiver in her agreement, Plan B might later have been able to file another motion to arbitrate against class members who had signed the other version of the agreement once the class had been certified. But that hypothetical possibility does not change the fact that a motion to arbitrate against Sprunk would likely have determined whether the claims at issue in this case should be arbitrated, probably for all class members, but at least for those class members who signed the same version of the agreement as Sprunk. Moreover, Plan B does not claim that it declined to seek arbitration against Sprunk because it only wanted to arbitrate against persons who signed the other version of the agreement. It could not credibly do so, as it ultimately filed motions below seeking arbitration against class members under both versions of the agreement.

17

file its motions to compel arbitration until August 12, 2015, over a year after that decision and after the trial court had issued its order certifying the class on April 24, 2015.

Based upon this sequence of events, the trial court explained its conclusion: "So, I think, the defendants rolled the dice again thinking, maybe, the class wouldn't be certified. I don't know. But that was quite a delay between the time *Iskanian* came down and the time defendants said we wanted to file our motion. So, I think, the actions were inconsistent with the right to arbitrate."

An attempt to gain a strategic advantage through litigation in court before seeking to compel arbitration is a paradigm of conduct that is inconsistent with the right to arbitrate. For example, *Bower* was a putative wage and hour class action in which the defendant engaged in discovery and attempted to settle the case on a classwide basis when the class was a modest size. (*Bower, supra,* 232 Cal.App.4th at pp. 1038–1040.) When the plaintiff sought an amendment that would have expanded the class, the defendant (Inter-Con) moved to compel arbitration. The trial court found waiver, and the appellate court affirmed, concluding that Inter-Con's decision to delay seeking arbitration "appears to have been tactical." (*Id.* at pp. 1045, 1049). Based upon Inter-Con's litigation conduct, "[o]ne can infer that Inter-Con chose to conduct discovery, delay arbitration, and seek a classwide settlement because it saw an advantage in pursuing that course of action in the judicial forum." (*Id.* at p. 1049.) Such conduct provided substantial evidence to support the finding that "Inter-Con's actions were inconsistent with a right to arbitrate." (*Id.* at p. 1045.)

18

The court in *Oregel v. PacPizza, LLC* (2015) 237 Cal.App.4th 342 (*Oregel*) also relied upon a defendant's strategic decision in finding waiver. The defendant, PacPizza, engaged in discovery and delayed moving to compel arbitration until after the plaintiff had filed his motion for class certification. (*Id.* at pp. 346–348.) The trial court found waiver on a number of grounds, including that PacPizza made the strategic decision to seek arbitration after seeing the plaintiff's class certification motion. (*Id.* at pp. 350–351.)

The appellate court affirmed, rejecting PacPizza's explanation that it delayed filing a motion to compel arbitration until *Iskanian* had clarified the law on class arbitration. In analysis that is equally appropriate here, the court concluded that PacPizza's decision not to move to compel arbitration until after the plaintiff had filed his class certification motion was consistent with a strategic decision rather than a bona fide desire to await clarification of the law: "[I]f PacPizza had truly believed the arbitration agreement was unenforceable prior to *Iskanian*, as it would have us believe, the looming issue of class certification would not have made any difference: Either the state of the law supported enforcement of the agreement or it did not. Instead, the record suggests that PacPizza believed it could keep open the option of arbitrating the dispute while it conducted discovery, but when it appeared the class was going to be certified, it asserted its purported right to arbitrate to preempt certification." (*Oregel*, *supra*, 237 Cal.App.4th at pp. 358–359.) The court concluded that this strategic decision "should not be rewarded." (*Id.* at p. 359.)

Similarly, here there is substantial evidence to support the conclusion that Plan B's delay in moving to compel arbitration

19

until after a ruling on class certification was a strategic decision to attempt to win the case by defeating the class before seeking to arbitrate. Such a strategic use of the judicial forum is inconsistent with an arbitration right and supports a waiver finding.

Plan B cites *Sky Sports* and *Lee v. Southern California University for Professional Studies* (2007) 148 Cal.App.4th 782 for the proposition that it is premature to bring a motion to compel arbitration against unnamed class members until the class has been certified. But neither of those cases involved a situation where a named plaintiff in a putative class action had agreed to arbitrate. Because the named plaintiffs in those cases had not signed arbitration agreements, the courts concluded that they could not be compelled to arbitrate, even though the putative class included persons who had signed such agreements. (*Sky Sports, supra*, 201 Cal.App.4th at pp. 1367–1369; *Lee*, at pp. 786–788.) The courts in those cases had no reason to consider whether a defendant who decides for strategic reasons not to pursue arbitration against a named plaintiff who *did* sign an arbitration agreement could waive its right to arbitrate against the class.

Plan B also cites several federal district court cases for the proposition that unnamed class members are not parties until a class has been certified. (*TFT-LCD (Flat Panel) Antitrust Litigation* (N.D.Cal., May 9, 2011) 2011 U.S. Dist. LEXIS 55033 (*TFT-LCD*); *Saleh v. Titan Corp.* (S.D.Cal. 2004) 353 F.Supp.2d 1087, 1091 (*Saleh*); *Laguna v. Coverall North America* (S.D.Cal. July 26, 2011) 2011 U.S. Dist. LEXIS 81105 (*Laguna*); *Mora v. Harley-Davidson Credit Corp.* (E.D.Cal. April 9, 2012) 2012 U.S. Dist. LEXIS 49636 (*Mora*).) Those cases are not controlling, and

20

in any event do not purport to describe a general rule that would require reversal here.

In *TFT-LCD*, *supra*, 2011 U.S. Dist. LEXIS 55033, the only one of these cases that dealt with delay in moving to compel arbitration against a named plaintiff, the court found the issue of waiver "extremely close," and characterized the defendants' delay as conduct that "evinces either previous indifference to the arbitration clauses they now seek to assert or, possibly, a strategic decision to delay their enforcement." (*Id.* at p. *28.) The case was a complex, multi-defendant antitrust class action in which, unlike here, not all class members (and apparently not even all named plaintiffs) had signed arbitration agreements. (*Id.* at pp. **22–23.) Thus, unlike here, a motion to compel arbitration earlier in the case presumably could not have been dispositive. The district court's discretionary decision not to find waiver based upon these facts does not support a general rule that would preclude the trial court's waiver finding here.[6]

---

[6] *Saleh* did not involve an arbitration provision; it held that putative class members are not parties to a class action for purposes of enjoining them from proceeding with a separate federal action under the " 'first-to-file' " rule. (*Saleh, supra,* 353 F.Supp.2d at pp. 1090–1092.) *Laguna* did not involve an issue of waiver, but simply observed in the course of denying a discovery motion that a motion to compel arbitration against absent class members would be premature prior to certification. (*Laguna, supra*, 2011 U.S. Dist. LEXIS 81105 at p. *8.) In *Mora,* the court did not find that the defendant had delayed seeking arbitration against the named plaintiff or even that the named plaintiff was a party to an arbitration agreement. Indeed, from the court's summary of facts it appears that the named plaintiff was not. (*Mora, supra,* 2012 U.S. Dist. LEXIS 49636 at pp. **4, 36, 46–47.)

21

Thus, the abstract question of whether absent class members are parties to a class action prior to certification is not decisive here. The trial court could properly consider Plan B's delay in seeking arbitration against Sprunk when deciding whether it had waived its right to compel arbitration against unnamed class members following certification.

For the reasons discussed below, the trial court also properly concluded that Plan B's stated reasons for delaying a motion to compel against *Sprunk* were not sufficient to avoid waiver.

####  ii.   *Plan B's asserted reason for withdrawing its motion to compel against Sprunk does not justify its decision to litigate in court rather than arbitrate*

Plan B argues that its withdrawal of its motion to compel arbitration against Sprunk and its subsequent participation in the litigation should not be considered in a waiver analysis because it acted reasonably based upon the state of the law on class arbitration at the time. Specifically, Plan B claims that it reasonably withdrew its motion to compel arbitration against Sprunk because "it believed individual arbitration was foreclosed under then current law." Before considering the merits of this argument, it is helpful to recap briefly the state of the law prior to our Supreme Court's decision in *Iskanian.*

In 2005, the court held in *Discover Bank, supra,* 36 Cal.4th 148, that class arbitration waivers were unconscionable and unenforceable under California law when included in consumer contracts of adhesion, where "it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually

small sums of money." (*Id.* at pp. 162–163.) The court subsequently held in *Gentry*, *supra*, 42 Cal.4th 443, that class action waivers in employment arbitration agreements *might* be unenforceable on the ground that they "undermine the vindication of the employees' unwaivable statutory rights." (*Id.* at p. 450.) The court directed trial courts to consider various factors to determine whether "a class arbitration is likely to be a significantly more effective practical means of vindicating the rights of the affected employees than individual litigation or arbitration" and whether "the disallowance of the class action will likely lead to a less comprehensive enforcement of overtime laws for the employees alleged to be affected by the employer's violations." (*Id.* at p. 463.) If so, then the class arbitration waiver should not be enforced. (*Ibid.*)

In April 2011, the United States Supreme Court invalidated *Discovery Bank* in its ruling in *Concepcion*. (*Concepcion, supra,* 563 U.S. 333.) The court held that requiring the availability of classwide arbitration "interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." (*Id.* at p. 344.) The court concluded that the FAA therefore preempted "California's *Discovery Bank* rule." (*Id.* at p. 352.)

In 2012, the Board issued its decision in *Horton I, supra,* 357 NLRB 2277. The Board decided that the National Labor Relations Act (49 Stat. 449, 29 U.S.C. § 151 et seq. (NLRA)) generally prohibits contracts that require employees to waive their right to participate in class proceedings to resolve wage claims. The Board concluded that such contracts amount to an unfair labor practice under the NLRA because they interfere with the right of employees to engage in concerted activity. (*Horton I,*

23

at p. 2280.) The Board also found that the NLRA did not conflict with the FAA in invalidating such waivers. (*Id.* at pp. 2285–2288.)

The Board's rulings on these issues were subsequently reversed by the Fifth Circuit in December 2013. (See *Horton II, supra,* 737 F.3d 344.) The Fifth Circuit concluded that "[r]equiring a class mechanism is an actual impediment to arbitration and violates the FAA," and that neither the NLRA itself nor any inference from an inherent conflict between the FAA and the NLRA demonstrated any congressional command against application of the FAA. (*Id.* at p. 360.)[7]

Our Supreme Court's decision in *Iskanian* considered this history in the context of a wage and hour class action that involved an arbitration agreement containing an express class

---

[7] Federal circuits are split on this issue, and the issue is currently before the United States Supreme Court. (See *NLRB v. Alt. Entm't, Inc.* (6th Cir. 2017) 858 F.3d 393, 405 ["Mandatory arbitration provisions that permit only individual arbitration of employment-related claims are illegal pursuant to the NLRA and unenforceable pursuant to the FAA's savings clause"]; *Morris v. Ernst & Young, LLP* (9th Cir. 2016) 834 F.3d 975, 985–986, cert. granted Jan. 13, 2017, ___ U.S. ___ [137 S.Ct. 809] [arbitration provisions that mandate individual arbitration of employment-related claims violate the NLRA and fall within the FAA's saving clause]; *Lewis v. Epic Sys. Corp.* (7th Cir. 2016) 823 F.3d 1147, 1160, cert. granted Jan. 13, 2017, ___ U.S. ___ [137 S.Ct. 809] [same]; *Cellular Sales of Mo., LLC v. NLRB* (8th Cir. 2016) 824 F.3d 772, 776 [arbitration provisions that mandate individual arbitration of employment-related claims do not violate the NLRA]; *Murphy Oil, USA, Inc. v. NLRB* (5th Cir. 2013) 737 F.3d 344, cert. granted Jan. 13, 2017, ___ U.S. ___ [137 S.Ct. 809] [upholding the Fifth Circuit's prior ruling in *Horton II*].)

action waiver. The court decided several issues relevant to the enforceability of class action waivers. First, the court confirmed that *Concepcion* invalidated *Gentry*. The court explained that, under the holding in *Concepcion*, the FAA preempts states from "mandating or promoting procedures incompatible with arbitration," and that "[t]he *Gentry* rule runs afoul of this . . . principle." (*Iskanian, supra,* 59 Cal.4th at p. 366.) The court also rejected the holding in *Horton I,* agreeing with the Fifth Circuit's ruling that the Board's decision was inconsistent with the FAA and was not justified by any " ' "contrary congressional command" ' " in the NLRA. (*Iskanian,* at p. 373.)

The final entry in this chronology is the United States Supreme Court's decision in *Stolt-Nielsen*. In that case, decided in 2010, the court held that, under the FAA, no party may be compelled to participate in class arbitration "unless there is a contractual basis for concluding that the party *agreed* to do so." (*Stolt-Nielsen, supra,* 559 U.S. at p. 684.) The case did not involve a class action waiver; rather, the contract at issue was silent on the issue of class arbitration.[8] The court concluded that an agreement for class arbitration could not be inferred from the contract "because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator." (*Id.* at p. 685.)

---

[8] The parties in that case stipulated that the contract's silence meant that there was " 'no agreement' " on the issue of class arbitration. (*Stolt-Nielsen*, *supra*, 559 U.S. at p. 687, fn. 10.)

In light of this history, Plan B's argument that its delay in seeking arbitration against Sprunk was reasonable based upon the state of the law is unpersuasive for several reasons.

### a. *Plan B delayed unreasonably even after the decision in* Iskanian

Plan B claims that the opinion in *Iskanian* changed the legal landscape. However, as discussed above, that argument does not explain Plan B's delay of over a year in moving to compel arbitration *after* the Supreme Court decided that case. Plan B attempts to justify its delay by reiterating its argument that a motion to compel arbitration against unnamed class members would have been premature prior to certification. But that has nothing to do with the state of the law on class arbitration. There was nothing precluding Plan B from moving to compel individual arbitration against *Sprunk* as soon as *Iskanian* was decided, even if Plan B had reasonably believed prior to that decision that such a motion would have been futile. (*Oregel, supra,* 237 Cal.App.4th at pp. 358–359.)

### b. *Plan B's motion would not have been "futile" before* Iskanian

Plan B claims that the law on class arbitration waivers was unsettled until the court's decision in *Iskanian* confirmed that *Concepcion* had overruled *Gentry,* and that the Board's ruling in *Horton I* would not be followed in California. However, while uncertainty remained, there was ample reason to conclude that Plan B could not comfortably rely on the decisions in *Gentry* or *Horton I* to excuse the failure to seek individual arbitration. In particular, a prudent litigant who was intent on avoiding an implication of waiver would not have taken such a risk.

26

Several Court of Appeal decisions prior to the Supreme Court's opinion in *Iskanian* suggested that *Concepcion* had invalidated *Gentry* and declined to follow *Horton I.* In *Nelsen v. Legacy Partners Residential, Inc.* (2012) 207 Cal.App.4th 1115 (*Nelsen*), the court affirmed the trial court's order enforcing an agreement for individual arbitration in an employment class action, rejecting the plaintiff's argument that individual arbitration violated public policy. The court declined to follow *Horton I.* (*Nelson*, at p. 1133.) With respect to *Gentry*, the court observed that the "continuing vitality" of that case "has been called into serious question" by *Concepcion.* (*Id.* at p. 1131.) Citing the Court of Appeal opinion in *Iskanian,* the court noted that "[o]ne California appellate court and a number of federal district courts have found *Concepcion* applies equally to *Gentry* and the FAA therefore precludes California courts from ordering classwide arbitration of wage and hour claims unless the parties have agreed to it." (*Nelsen*, at pp. 1131–1132.)

The court in *Nelsen* did not reach the issue of *Gentry's* continued viability, but the reason it did not do so would also have supported Plan B's motion to compel against Sprunk. The court noted that *Gentry* did not establish a "categorical rule applicable to the enforcement of class arbitration waivers in all wage and hour cases." (*Nelsen, supra,* 207 Cal.App.4th at p. 1132.) Rather, to show that a waiver is invalid, a plaintiff was required to prove the presence of a number of case-specific factors demonstrating that individual arbitration would not be adequate.[9] Because the plaintiff had not made such a showing in

---

[9] The factors were that: "(1) potential individual recoveries are small; (2) there is a risk of employer retaliation; (3) absent class members are unaware of their rights; and (4) as a practical

*Nelsen*, the court concluded that *Gentry* was not applicable even if it was still good law.

Similarly, in *Kinecta Alternative Financial Solutions, Inc. v. Superior Court* (2012) 205 Cal.App.4th 506 (*Kinecta*), disapproved on another ground in *Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 260, footnote 9, the court questioned the continued viability of *Gentry*, but held that it did not apply to that case in any event because the plaintiff failed to provide evidence showing the presence of the specific *Gentry* factors. (*Id.* at pp. 516–517.) And in *Truly Nolen of America v. Superior Court* (2012) 208 Cal.App.4th 487 (*Truly Nolen*), the court also questioned *Gentry* in light of *Concepcion* before concluding that stare decisis required it to follow *Gentry*. (*Id.* at pp. 506–507.) Nevertheless, as in *Nelsen* and *Kinecta*, the court held that *Gentry* did not invalidate the arbitration agreement in that case because the plaintiff had failed to present individualized evidence establishing the *Gentry* factors. (*Id.* at p. 510.) The court also declined to follow *Horton I*. (*Id.* at pp. 514–515.)

Here, in opposing Plan B's initial motion to compel, Sprunk did not provide any evidence showing the presence of the specific *Gentry* factors. Sprunk did not even argue that *Gentry* required class arbitration; she cited that case only for the proposition that, if arbitration were ordered, it must include certain procedural safeguards. Plan B did not withdraw its original motion to compel until September 6, 2012, after the Court of Appeal decisions in *Nelsen, Kinecta,* and *Truly Nolen.* Thus, even if the trial court in this case had decided that *Gentry* remained good

_____

matter, only a class action can effectively compel employer overtime law compliance." (*Nelsen, supra,* 207 Cal.App.4th at p. 1132.)

28

law, Plan B had ample authority to argue that *Gentry* did not apply to its motion.

In summary, well prior to our Supreme Court's decision in *Iskanian*, the state of the law on class arbitration in California was that (1) the continued viability of *Gentry* was in serious question following *Concepcion*, (2) even under *Gentry*, a class plaintiff resisting individual arbitration had to make a specific factual showing that only a class action could adequately protect unwaivable statutory rights (a showing that Sprunk did not make), (3) the Fifth Circuit had reversed *Horton I*, and (4) several California Courts of Appeal had rejected *Horton I*. While the outcome was not free from doubt, given this authority one could not reasonably describe Plan B's prospects of compelling individual arbitration prior to *Iskanian* as "futile."

That conclusion dooms Plan B's argument that it reasonably delayed moving to compel arbitration against Sprunk because of the state of the law. As the trial court correctly observed here, Plan B was not entitled to litigate indefinitely in court so long as there was some risk that it might lose a motion to compel individual arbitration. Plan B could reasonably make a strategic decision that it did not want to assume the risk that the trial court might order class arbitration. But risk is not the same as futility.

In *Iskanian*, the court held that the defendant's conduct in initially filing, and then withdrawing, a motion to compel arbitration in a wage and hour class action did not amount to waiver because the state of the law at the time the defendant (CLS) withdrew the motion would have made the motion futile. (*Iskanian, supra,* 59 Cal.4th at pp. 374–378.) CLS had filed the motion before our Supreme Court decided *Gentry*, and the trial

29

court granted it. (*Id*. at p. 375.) However, while the case was in the appellate court, the Supreme Court issued its opinion in *Gentry*, and CLS withdrew its motion. (*Ibid*.) When the United States Supreme Court subsequently decided *Concepcion*, CLS quickly filed a renewed motion to compel arbitration and to dismiss the class (which had been certified in the interim). (*Ibid*.)

The court held that CLS's delay was reasonable in light of the state of the law and did not support waiver. (*Iskanian, supra,* 59 Cal.4th at pp. 376–378.) The court concluded that "futility as grounds for delaying arbitration is implicit in the general waiver principles we have endorsed." (*Id*. at p. 376.) Significantly, the court described the "futility" doctrine using language as strong as the label suggests: "The fact that a party initially successfully moved to compel arbitration and abandoned that motion only after a change in the law made the motion *highly unlikely* to succeed weighs in favor of finding that the party has not waived its right to arbitrate." (*Ibid*., italics added.) In later discussing the issue of prejudice, the court similarly explained: "Where, as here, a party promptly initiates arbitration and then abandons arbitration because it is resisted by the opposing party and *foreclosed by existing law,* the mere fact that the parties then proceed to engage in various forms of pretrial litigation does not compel the conclusion that the party has waived its right to arbitrate when a later change in the law permits arbitration." (*Id*. at pp. 377–378, italics added.)

It is significant that the defendant in *Iskanian* did what Plan B claims it reasonably decided *not* to do here, i.e., move to compel arbitration once the United States Supreme Court had decided *Concepcion*. In its initial arbitration demand letter to Sprunk in 2011, Plan B cited *Concepcion* in identifying "new case

law" that permits individual arbitration "despite class allegations." While Plan B perhaps later reassessed the risk that its interpretation of *Concepcion* was wrong, that risk was based on lingering uncertainty, not on existing law that "foreclosed" its motion to compel. (*Iskanian, supra,* 59 Cal.4th at pp. 377–378.) In any event, regardless of the ultimate impact of *Concepcion*, Plan B had ample reason to believe that neither *Gentry* nor *Horton I* would affect the enforceability of its arbitration agreements in light of the existing case law and the lack of evidence from Sprunk concerning the *Gentry* factors.

### c. Iskanian *was irrelevant to whether the arbitration agreement that Sprunk signed contemplated class arbitration*

A large part of the risk of class arbitration that existed at the time Plan B withdrew its motion to compel was not affected by the subsequent ruling in *Iskanian*. Much of the argument concerning class arbitration in the briefing on Plan B's motion dealt with the question whether the version of the arbitration provision in Sprunk's employment agreement—which did not address class arbitration—could be interpreted to include an agreement to arbitrate on a class basis. The answer to that question was controlled by the United States Supreme Court decision in *Stolt-Nielsen*, which was decided in 2010. Plan B does not claim that *Iskanian* had any effect on the interpretation of *Stolt-Nielsen*.

Indeed, in opposing Plan B's motion to compel Sprunk argued that *Concepcion* was not even relevant because it concerned the enforceability of an express class action waiver, which Sprunk's agreement did not have. Whatever the ultimate

31

merits of that argument,[10] it underscores that the major issue concerning class arbitration raised by Plan B's motion—that is, whether the agreement itself permitted class arbitration—was not affected by the subsequent legal developments that Plan B claims changed the legal landscape and ultimately made its motion viable.

Thus, we conclude that Plan B's delay in bringing its motion to compel was not excused either by the lack of a certified class or by the state of the law.

### d. *The* St. Agnes *factors support the trial court's waiver finding*

The circumstances of Plan B's delay in seeking arbitration against *Sprunk* support the trial court's waiver finding under the factors that our Supreme Court identified in *St. Agnes*. (*St. Agnes, supra,* 31 Cal.4th at p. 1196.) Having concluded that Plan B's delay cannot reasonably be explained either by the state of the law or the lack of a certified class, the period of the unexcused

---

[10] There is conflicting authority on whether *Concepcion* and *Iskanian* are relevant to employment arbitration agreements that do not contain a class action waiver. In *Oregel*, the court rejected the defendant's argument that a motion to compel arbitration would have been futile before *Iskanian* because the arbitration agreement at issue did not contain a waiver. The court concluded that the line of cases on which the defendant relied (i.e., *Discover Bank, Gentry, Concepcion*, and *Iskanian*) involved the enforceability of class action waivers and therefore was not relevant. (*Oregel, supra,* 237 Cal.App.4th at pp. 357–358.) In contrast, in *Nelsen*, which also concerned an arbitration agreement without an express waiver, the court held that "*Gentry's* application should not turn on whether an arbitration agreement bars class arbitration expressly or only impliedly." (*Nelsen, supra,* 207 Cal.App.4th at p. 1127.)

delay—nearly four years between the date that Sprunk filed her complaint on October 7, 2011, and the date that Plan B moved to compel arbitration on August 12, 2015—is far longer than in many cases finding waiver. (See, e.g., *Oregel, supra,* 237 Cal.App.4th at p. 359 [17 months' delay]; *Bower, supra,* 232 Cal.App.4th at pp. 1039–1040 [nine months' delay]; *Sobremonte, supra,* 61 Cal.App.4th at pp. 993–994 [10 months' delay]; *Lewis v. Fletcher Jones Motor Cars, Inc.* (2012) 205 Cal.App.4th 436, 446 [nearly five months' delay].) Thus, the facts support the third *St. Agnes* factor of a delay for a long period before seeking a stay. (*St. Agnes, supra,* 31 Cal.4th at p. 1196.)

Litigation events during the long delay also support the first and fifth factors, conduct inconsistent with the right to arbitrate and important intervening steps. (*St. Agnes, supra,* 31 Cal.4th at p. 1196.) As discussed above, Plan B's strategic decision to delay until after class certification was inconsistent with an intent to arbitrate. In addition, while Plan B argues that it did not initiate much discovery during the delay, the class certification motion itself was a significant litigation event. The motion discussed Sprunk's factual and legal theories and disclosed her positions and evidence on disputed issues. (See *Oregel, supra,* 237 Cal.App.4th at p. 358 [PacPizza waited to move for arbitration until the plaintiff had filed his class certification motion, "taking the opportunity to examine his motion and supporting evidence"].)

Plan B argues that the second *St. Agnes* factor—whether the litigation machinery has been substantially invoked before the party notified the opposing party of an intent to arbitrate (*St. Agnes, supra,* 31 Cal.4th at p. 1196)—does not apply here because it repeatedly notified Sprunk and the trial court of its intent to

33

arbitrate, including in its affirmative defenses, discovery responses, and its opposition to class certification. The trial court in fact noted that arbitration "was always on the table." However, as the trial court also observed, there is a difference between stating an intent and actually following through with asserting a right. That Plan B asserted arbitration as a defense was "merely one factor for the court to consider." (*Sobremonte, supra,* 61 Cal.App.4th at p. 993.) Identifying the arbitration right as an affirmative defense in pleadings "does not preclude a finding that subsequent conduct may cause a waiver of that right." (*Ibid.,* citing *Davis v. Continental Airlines, Inc.* (1997) 59 Cal.App.4th 205, 217.)

The fourth *St. Agnes* factor asks whether the defendant filed a counterclaim without asking for a stay. (*St. Agnes, supra,* 31 Cal.4th at p. 1196.) Plan B did file a counterclaim. However, it does not appear that the trial court attached much weight to that event, and neither do we. Plan B filed the counterclaim against Sprunk and various fictional Roe defendants, but it did not attempt to amend the counterclaim to substitute particular class members for the fictional defendants and it later dismissed the counterclaim. Thus, Plan B did not obtain any litigation advantage from its claim.

This leaves the sixth *St. Agnes* factor, prejudice, which is "critical in waiver determinations." (*St. Agnes, supra,* 31 Cal.4th at p. 1203.) The trial court appeared to find prejudice in part from the likelihood that, because of the nature of Plan B's business, individual plaintiffs would be reluctant to press arbitration claims. As Plan B points out, this concern would be present no matter when it asserted its arbitration right, and

34

therefore does not show prejudice from its delay.  We therefore do not give it any weight in assessing prejudice.

However, the trial court also found that Plan B's four-year delay in asserting its arbitration right was inconsistent with the principle that arbitration "is supposed to be quick."  The court concluded that, if it granted the motion to compel, "it's going to be quite a while before these plaintiffs get their claims heard."

While "merely participating in litigation" does not cause a waiver (see *St. Agnes, supra,* 31 Cal.4th at p. 1203), in *Iskanian* our Supreme Court cited a number of cases in which courts had interpreted *St. Agnes* to "allow consideration of  the expenditure of time and money in determining prejudice where the delay is unreasonable." (*Iskanian, supra,* 59 Cal.4th at p. 377; see *Oregel, supra,* 237 Cal.App.4th at p. 361 [noting that in *Iskanian* "the Supreme Court endorsed the line of cases that have interpreted *St. Agnes* to allow consideration of the expenditure of time and money in determining prejudice where the delay was unreasonable or unjustified"].)  The court quoted *Burton v. Cruise* (2010) 190 Cal.App.4th 939 for its conclusion that " 'a petitioning party's conduct in stretching out the litigation process itself may cause prejudice by depriving the other party of the advantages of arbitration as an "expedient, efficient and cost-effective method to resolve disputes." ' " (*Iskanian*, at p. 377, quoting *Burton,* at p. 948.)

Here, the four-year delay resulted in Sprunk conducting class-related discovery and preparing and arguing an extensive class certification motion that never would have been necessary if individual arbitration had been ordered earlier in the case. Because Plan B's delay was unreasonable, we conclude that the

trial court's finding of prejudice is supported by sufficient evidence.[11]

## DISPOSITION

The trial court's order denying the motions to compel arbitration is affirmed.  Sprunk is entitled to her costs on appeal.

CERTIFIED FOR PUBLICATION.


                                        LUI, J.

We concur:


CHANEY, Acting P. J.


JOHNSON, J.

---

[11] Because we affirm the trial court's waiver finding, there is no need to consider Sprunk's argument that the arbitration provisions were unconscionable.